[650 NYS2d 194]

Susan Liberman, Appellant, v Riverside Memorial Chapel, Inc., Respondent, et al., Defendant.

First Department, December 5, 1996

## APPEARANCES OF COUNSEL

*C. Daniel Chill* of counsel (*Elaine M. Reich* and *Gary S. Mayerson* on the brief; *Graubard Mollen Horowitz Pomeranz & Shapiro,* attorneys), for appellant.

*Marc Wolinsky* of counsel (*Michael W. Schwartz* and *David R. Lurie* on the brief; *Wachtell, Lipton, Rosen & Katz,* attorneys), for respondent.

*Sheldon Silver* for Union of Orthodox Congregations of America, *amicus curiae.*

*A. Stanley Robinson* and *John D. D'Ercole* of counsel (*Robinson Brog Leinwand Greene Genovese & Gluck, P. C.,* attorneys), for Jewish Funeral Directors of America, Inc., *amicus curiae.*

## OPINION OF THE COURT

Nardelli, J.

Many forms of honoring and respecting the mysteries of life and death are found among the religious and nonreligious alike. "So God created humankind in his own image, in the image of God he created them; male and female he created them." (Genesis, ch 1, verse 27.) Millennia after these words were

transcribed, many religions continue to hold the belief that humans have been created in the image of the Almighty. In a more secular vein, Walt Whitman, our great American poet and fellow New Yorker, wrote in Leaves of Grass, "If anything is sacred the human body is sacred". As a result of this religious and philosophical belief, most persons, believers or nonbelievers, will not countenance disrespectful treatment of the body.

In recognition of these sentiments and the fact that various religious groups, including the Orthodox Jewish community, regard autopsies as desecrations of the body and abrogations of the respect due it, in violation of their religious principles, the circumstances under which autopsies may be performed are limited by the laws of the State of New York.

Two years before the occurrences herein, the Legislature amended the Public Health Law by enacting section 4210-c (popularly known as "the Silver Law", named for its sponsor, the present Speaker of the Assembly, Sheldon Silver). This section prohibits autopsies when the procedure is contrary to religious beliefs and there is no compelling public necessity for such a procedure. Pursuant to section 4210-c, when the family objects, "or, if there is otherwise reason to believe that a dissection or autopsy is contrary to the decedent's religious beliefs" ( 4210-c [1]), the Office of the Chief Medical Examiner is not permitted to perform such a procedure without giving notice or letting a period of time elapse so that legal proceedings can be instituted to determine the propriety of such procedure, or, in certain circumstances, without obtaining a court order showing the "need" for the autopsy.

On July 6, 1985, plaintiff's father, Philip Braun, a devout Orthodox Jew, who attended synagogue daily, observed a strict kosher diet and served as a member of the Orthodox Jewish burial society for nearly 40 years, slipped and suffered severe burns while showering. He was brought to the Cornell Burn Unit of New York Hospital, where, three weeks later on Sunday, July 28, 1985, at 8:15 P.M., he died from infection-related complications.

Plaintiff, Susan Liberman, who is the decedent's daughter, and her husband Barry Liberman, a rabbi, both of whom are also devout Orthodox Jews, made the funeral and burial arrangements. Mr. Liberman was advised by the decedent's attending physician, Dr. Vitolo, that to secure release of the body he should have the decedent's rabbi notify the Chief Medical Examiner's Office that the decedent was a religious

Orthodox Jew and that the family would object to an autopsy. About 30 minutes after Mr. Liberman spoke to the rabbi, Dr. Vitolo informed Liberman that the Medical Examiner, a Dr. Douglas Jackson, had released the body for burial and declared the death a "no-case". At about 9:30 P.M. that Sunday evening, members of the Orthodox Jewish burial society arrived and removed Mr. Braun's body to the defendant Riverside Memorial Chapel.

Riverside Memorial Chapel is a well-known and prestigious funeral home in Manhattan. It advertises that it is "the symbol of Jewish tradition—the most respected name in Jewish funeral service in the world", "serv[ing] Jewish families with respect and a special understanding" and "honor[ing] their needs". It is a member of the Jewish Funeral Directors of America and approximately 99% of its funerals are Jewish funerals.

In making the arrangements for Mr. Braun's funeral, Mr. Liberman provided Riverside with the following information, which the defendant entered on an "arrangement sheet": that Mr. Braun was an Orthodox Jew; that Congregation Morya (known by Riverside to be Orthodox) was involved; and the home telephone numbers of the Liberman family. Early the next morning, Riverside called the Chief Medical Examiner's Office. The testimony showed that Riverside was aware that "the death involved an injury", i.e., the burns to the body the decedent had suffered three weeks earlier, and that "cases involving injuries are supposed to be medical examiner cases", i.e., have autopsies performed. Riverside called to bring this to the attention of the Medical Examiner and to ask why the death had been classified "a no-case" when there had been injuries. Dr. Beverly Leffers, a Deputy Chief Medical Examiner, was told of Riverside's inquiry at about eight in the morning when she arrived at work. She reviewed the report of death form prepared the previous evening by the medical investigator, Dr. Jackson. Dr. Leffers did not see any indication of the family's religious objection (it was conceded that Dr. Jackson had failed to indicate the objection on the form), or any other reason for the classification as a "no-case", and, therefore, reversed Dr. Jackson's decision. When Riverside received the Medical Examiner's call, Mr. Burton Sheinhaus, an employee, testified that he advised the Chief Medical Examiner's Office that Mr. Braun was an Orthodox Jew, and further, that he assumed they were just going to take a look at the body and issue a new death certificate. It did not cross his mind that the

Medical Examiner would do an autopsy. However, neither Sheinhaus nor Riverside requested that the Medical Examiner merely conduct a "field investigation", where a body is examined at the funeral home or place of death, rather than transporting the body for an autopsy.

Dr. Leffers, however, denied that at any time prior to the performance of the autopsy Riverside or anyone else had advised the Chief Medical Examiner's Office that Mr. Braun was an Orthodox Jew. She testified that there were no records, memos or "anything that reflects that the medical examiner received a phone call from anyone at Riverside objecting to the autopsy going forward". Had Riverside advised the Medical Examiner that Mr. Braun was an Orthodox Jew or that there was a religious objection to autopsy, an autopsy would never have been performed.

Mr. Sheinhaus testified that he told the Chief Medical Examiner's Office "that the funeral was scheduled for that day"; that he "was sending the body"; but that he "was going to call the family first". Sheinhaus claims that at 7:45 A.M., immediately after speaking with the Chief Medical Examiner's Office, he tried unsuccessfully to call the decedent's family members. Despite having been provided the home and work telephone numbers for the decedent's daughter and her husband, who had completed the "arrangement sheet", the Libermans were **not** among the three persons Sheinhaus claims to have tried to reach. At 8:15 A.M., Sheinhaus called the Chief Medical Examiner's Office back and told them that he "was sending [Mr. Braun's body] down with a man and the watcher". He again stressed "that the funeral was scheduled for that day" (i.e., 2 o'clock) and the body "would have to be released as soon as possible". Based on the needs of Riverside, the Chief Medical Examiner's Office promised "that they would do everything that's possible to have the doctor do it immediately and * * * release [the body] as soon as possible".

Immediately after this call, between 8:15 and 8:30 A.M., Riverside funeral director Joseph Franza and the religious observer or watcher known as the "shomer" brought Mr. Braun's body to the City morgue in Riverside's own station wagon. The drive took approximately 30 to 45 minutes. Although no one from the decedent's family had yet been contacted by Riverside, Sheinhaus demanded that Franza "make sure that [the Chief Medical Examiner's Office] know[s] it's todays funeral and *whatever they are doing*, to get it done fast" (emphasis added). Riverside records reveal that the day on which Braun's funeral

was scheduled was a "light" day and that there were three times as many funerals scheduled for the following day. Mr. Franza directed the "shomer", who spoke little English, to wait in the car and, according to Dr. Leffers, the autopsy began sometime after 9:30 or 10:00 A.M. Sometime thereafter, it was immediately aborted by order of Dr. Leffers when she received a call from Rabbi Joseph Weiss advising the Chief Medical Examiner's Office that there was a religious objection to an autopsy being performed. Leffers recalls only that she received Rabbi Weiss' call sometime after 10:00 A.M.

Burton Sheinhaus testified that he reached Mr. Rottenberg, head of the Orthodox burial society, by telephone "after the body left for the Medical Examiner's Office". He had "no idea" what time this was. He told Rottenberg "what had transpired" and Rottenberg said "they would do whatever they could to stop it". Plaintiff's family, however, never received a call from Riverside advising them that an autopsy had been ordered or was in progress. Plaintiff recalled that they received a call from Mr. Rottenberg between 9:30 or 10:00 A.M. Her husband stated that he did not know what time the call was received but guessed that it could have been between 8:30 and 9:00 A.M. Rottenberg advised the Libermans "that an autopsy was in progress and [they] should make whatever efforts [they] could to have the process curtailed". Upon Rottenberg's advice, the Libermans contacted several rabbis seeking their intercession. They continued contacting rabbis until they learned that the autopsy had been stopped. The autopsy was immediately halted, as indicated, when Dr. Leffers received a call from Rabbi Weiss. While the court would not permit Mr. Liberman to get into "the gory details" of what he saw when he identified his father-in-law's body at the Chief Medical Examiner's Office, it is obvious from his testimony and the arguments of counsel that the body was mutilated in the course of the aborted autopsy.

The jury awarded plaintiff $75,000 in compensatory damages, 90% against Riverside and 10% against the City and $1,350,000 in punitive damages solely against Riverside. The IAS Court dismissed the punitive damages award in its entirety.

We find that the IAS Court erred in usurping the jury's role and setting aside, in toto, the award for punitive damages as a matter of law, and in relying upon an inapplicable section of the Public Health Law in so doing, and we therefore modify the judgment.

■ While defendant Riverside continues to raise both liability and causation defenses upon this appeal, asserting that the autopsy was caused by the City, and *not* by anything it did or failed to do, Riverside has not appealed the judgment, the jury's underlying finding of liability or its apportionment of damages as between Riverside and the City. Therefore, the jury's findings as to liability and causation are now final as to Riverside.

■ The Trial Court set aside the jury award of punitive damages as a matter of law. "[T]he question whether a verdict is against the weight of the evidence involves what is in large part a discretionary balancing of many factors (see *Mann v Hunt*, 283 App Div 140). For a court to conclude as a matter of law that a jury verdict is not supported by sufficient evidence, however, requires a harsher and more basic assessment of the jury verdict. It is necessary to first conclude that there is simply no valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion reached by the jury on the basis of the evidence presented at trial. The criteria to be applied in making this assessment are essentially those required of a Trial Judge asked to direct a verdict. It is a basic principle of our law that 'it cannot be correctly said in any case where the right of trial by jury exists and the evidence presents an actual issue of fact, that the court may properly direct a verdict' (*McDonald v Metropolitan St. Ry.*, 167 NY 66, 69-70; accord *Loewinthan v Le Vine*, 299 NY 372; *Wessel v Krop*, 30 AD2d 764). Similarly, in any case in which it can be said that the evidence is such that it would not be utterly irrational for a jury to reach the result it has determined upon, and thus a valid question of fact does exist, the court may not conclude that the verdict is as a matter of law not supported by the evidence (see *Middleton v Whitridge, supra,* pp 507-508)." (*Cohen v Hallmark Cards*, 45 NY2d 493, 499.)

Applying these principles to the action of the trial court in dismissing the punitive damage award as a matter of law, it is evident that the court erred. There was a "valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion * * * on the basis of the evidence presented at trial". *(Supra,* at 499.) The evidence presented to this jury showed that Riverside described and advertised itself as adhering to the highest standards of Jewish funerary practices with a "special understanding of the needs of Jewish families". There was undisputed proof that Riverside

knew that the decedent was an Orthodox Jew, and that, as a general rule, Jewish law forbids autopsies. Further, there was a showing before the jury that Riverside failed to apprise its funeral directors, including Mr. Franza, of Jewish burial law, including the law against autopsies, although it held itself out as an authority and practitioner of the highest Jewish standards and traditions. The defendant also failed to inform itself or its funeral directors of the prohibitions and public policy expressed in Public Health Law § 4210-c, even though it was and is a self-proclaimed Jewish funeral parlor doing business in the State. There was evidence before the jury that Riverside was a completely owned subsidiary of Service Corporation International, a large New York Stock Exchange listed corporation which owns "quite a few" funeral homes in New York and throughout the country. This resulted in the fact that many of Riverside's funeral directors have never worked in a Jewish funeral home prior to their employment in Riverside. Although two Riverside funeral directors who testified, Joseph Franza and Clifford Abrams, both came to Riverside without any experience doing Jewish funerals, no special advance training or instruction was provided them in Jewish burial practices.

The evidence presented to the jury also showed that Riverside initiated and instigated the Braun autopsy, *after* the Medical Examiner initially determined no autopsy was necessary. Although defendant asserts it simply complied "with the Medical Examiner's apparently lawful instructions", at the time Mr. Braun's body arrived at Riverside, the Medical Examiner had *already* declared the death to be a "no-case". Riverside, nevertheless, took it upon itself, without any legal duty to do so, to initiate the autopsy procedure. While Riverside cites Administrative Code of the City of New York § 17-201, *requiring* "any citizen" to notify the Medical Examiner of the death of any person by casualty as justification for its call after the death had already been classified a "no-case" by the Chief Medical Examiner's Office, that section *also* requires "any citizen" becoming aware of such a death to "report such death forthwith * * * to a police officer who shall forthwith notify the officer in charge of the station-house in the police precinct in which such person died" (*ibid*). Riverside did *not* notify the police and, therefore, did *not* comply with this self-imposed statutory duty.

The evidence further allowed the jury to reach the reasonable inference that the defendant did not attempt to reach the family members who had left phone numbers with it because

it was intent on having the autopsy performed immediately for its *own* convenience, i.e., so that the funeral could be held the same day rather than the next day when a scheduling problem would be presented. The appointed day for Mr. Braun's funeral (the day of the autopsy) only had three funerals scheduled. However, the next day had nine funerals scheduled and the jury obviously reasoned that Riverside wanted the autopsy, necessary only because of its meddling, to be completed in time for the funeral and not postponed a day later.

"Punitive damages are awarded in tort actions '[w]here the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime' (Prosser and Keeton, Torts § 2, at 9 [5th ed 1984]). That author also teaches that:

" 'Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or "malice," or a fraudulent or evil motive on the part of the defendant, *or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton'* (Prosser and Keeton, Torts § 2, at 9-10 [5th ed 1984])." (*Prozeralik v Capital Cities Communications*, 82 NY2d 466, 479 [emphasis added]; *see also, Home Ins. Co. v American Home Prods. Corp.*, 75 NY2d 196, 203-204.)

The evidence presented that Riverside instigated the call for a reevaluation of the "no-case" decision of the Medical Examiner and also "rushed" the body to the Office of the Chief Medical Examiner to have the autopsy performed immediately for its own scheduling convenience, without notifying the family members, in disregard not only of Jewish religious law but of the provisions of the "Silver" law, all furnished a valid line of reasoning by which the jury could reach the permissible inference that Riverside had acted consciously and deliberately in complete disregard of both civil and religious law in its actions, thereby justifying the award of punitive damages. In fact, defendant's employee, when asked if he had been aware of the "Silver" statute in 1985 would he have dealt with the situation any differently, testified unequivocally: "No, sir, I don't think I would have".

In dismissing the punitive damages award against Riverside in its entirety, the trial court ignored section 4210-c of the Public Health Law and rested upon section 4210-b, which deals with unauthorized autopsies upon decedents who carry identification cards specifying an objection to autopsy. In that

circumstance, a "good faith" exception applies if the identification card is not located upon a routine examination of the decedent and his effects. This section, however, has no application herein where the controlling statute is section 4210-c, which provides no "good faith" protection for those who transgress it. Thus, it provides, in pertinent part: "no dissection or autopsy shall be performed over the objection of a surviving relative or friend of the deceased that such procedure is contrary to the religious belief of the decedent *[or where] there is otherwise reason to believe that a dissection or autopsy is contrary to the decedent's religious beliefs"* (§ 4210-c [1] [emphasis added]).

Section 4210-a, which is also applicable herein, provides: "A person who makes, *or causes or procures to be made*, any dissection of the body of a human being, except by authority of law, or in pursuance of a permission given by the deceased, is guilty of a misdemeanor" (emphasis added).

"Public Health Law article 42, which governs the disposition and autopsy of cadavers, reflects these concerns for respecting the corporeal remains of decedents and protecting the feelings of family members by strictly limiting the circumstances under which autopsies may be performed (*see,* Public Health Law § 4210). Indeed, absent a compelling public necessity, an autopsy may not be conducted over an objection of a surviving relative or friend that it would violate the decedent's religious beliefs (*see,* Public Health Law § 4210-c), and the performance of an autopsy without legal authority or the appropriate permission constitutes a misdemeanor (*see,* Public Health Law § 4210-a)." (*Bambrick v Booth Mem. Med. Ctr.,* 190 AD2d 646, 647.)

However, while we find that the jury properly awarded plaintiff punitive damages, we also find that the amount awarded was excessive since it was not reasonably related to the harm done and the flagrancy of the conduct (*I. H. P. Corp. v 210 Cent. Park S. Corp.,* 16 AD2d 461, 467, *affd* 12 NY2d 329).

Accordingly, the judgment of the Supreme Court, New York County (Bruce McM. Wright, J.), entered September 22, 1994, bringing up for review the order of the same court and Justice, entered July 21, 1994, which granted defendant's motion to set aside the jury verdict as to punitive damages, should be modified, on the law and facts, to the extent of denying defendant's motion and remanding the issue of punitive damages for a new trial, and otherwise affirmed, with costs and disbursements payable to plaintiff, unless plaintiff, within 20 days after ser-

vice of a copy of this order with notice of entry, stipulates to entry of an amended judgment awarding plaintiff the sum of $650,000 in punitive damages, in which event the judgment as amended should be affirmed, with costs and disbursements payable to plaintiff.

ELLERIN, J. P., WILLIAMS and TOM, JJ., concur.

Judgment, Supreme Court, New York County, entered September 22, 1994, bringing up for review the order of the same court and Justice, entered July 21, 1994, which granted defendant's motion to set aside the jury verdict as to punitive damages, modified, on the law and facts, to the extent of denying defendant's motion and remanding the issue of punitive damages for a new trial, and otherwise affirmed, with costs and disbursements payable to plaintiff, unless plaintiff, within 20 days after service of a copy of an order with notice of entry, stipulates to entry of an amended judgment awarding her the sum of $650,000 in punitive damages, in which event the judgment as amended is affirmed, with costs and disbursements payable to plaintiff.