OPINION OF THE COURT
Paul A. Victor, J.
The Issues Presented
The following novel legal issues are presented by defendant’s motion for summary judgment:
1. Does the law provide a Medical Examiner in the City of New York with an unfettered discretion to (a) investigate the circumstances of a death; and/or (b) to conduct an autopsy?
2. Does a request by a terminally ill decedent to decline medical treatment or to discontinue artificial life support, constitute, in and of itself, an “unusual circumstance” warranting the exercise of discretion to perform an autopsy?
3. Does a quadriplegia sustained by a decedent in an automobile accident which occurred 44 years ago serve as a rational basis for the exercise of discretion to perform an autopsy?
4. Does the failure by the next of kin to plead and prove the making of a prior objection based on “religious beliefs” require the dismissal of each of the plaintiff’s two causes of action?
The Claims, Motion and Relief Requested
Plaintiff, in both an individual and representative capacity, seeks (in a first cause of action) compensatory and punitive damages for intentional infliction of emotional distress, arising out of the alleged unauthorized autopsy conducted on the body of the decedent Junius Kellogg, a quadriplegic who died at the Bronx Veterans Affairs Medical Center on September 16, 1998. In a second cause of action, plaintiff seeks similar damages based on the allegation that the autopsy constituted an unlawful discrimination predicated on decedent’s disability.
This court takes judicial notice of what is common knowledge (see Hunter v New York Ontario & W. R. R. Co., 116 NY 615 [1889]) — that Junius Kellogg was “a dedicated public servant, an athlete of remarkable ability, and a man of courage and dignity” (statement by Mayor Giuliani, <www.ci.nyc.us/ html/om/html/98b/pr438-98.html>); that as a star center on the Manhattan College basketball team he refused to take a $1,000 bribe from a gambler and exposed a point-shaving gambling operation; and that after his career with the Harlem *758 Globetrotters ended in 1954 when he was paralyzed in a car crash, he worked with physically challenged persons, served in several agencies of the City of New York, and was nominated to the Basketball Hall of Fame.
The defendant City of New York moves pursuant to CPLR 3211 to dismiss each cause of action and/or for summary judgment pursuant to CPLR 3212. Defendant asserts that the New York City Charter provided the authorization and discretion for the Office of the Chief Medical Examiner (OCME) to perform an autopsy on the body of the decedent Junius Kellogg. Tracking the language of the Charter, the defendant claims that the decedent died “suddenly when in apparent health” and in a “suspicious or unusual manner,” because, among other things, “it was suspected [by the Office of the Chief Medical Examiner] that the automobile accident contributed to [his] death.” Defendant argues further that since “plaintiff has failed to demonstrate that defendants performed an unauthorized autopsy,” and that since plaintiff had failed to even plead, much less prove, a claim of religious objection (even though plaintiff was at the premises of OCME), each cause of action is deficient and must be dismissed as a matter of law.
Plaintiff argues that the autopsy was not authorized by statute since decedent clearly died from natural causes; that there was no consent to autopsy (express or implied); that no express objection to the autopsy was required by law or otherwise; that he did not expressly object while he was at the premises of the OCME because he was misled into believing that the autopsy had been performed prior to his arrival; and that he “did not have to put a sign on [his] brother’s body saying do not dissect in order to preserve [his] sacred familial relationship with [his] brother.” Plaintiff requests that the court search the record and grant judgment in his favor on the first cause of action. As to the second cause of action, which alleges discrimination based on disability, the plaintiff seeks an opportunity to conduct pretrial discovery to establish, among other things, that “the real reason why my brother’s body was dissected was to satisfy a morbid, cruel scientific curiosity.” He seeks compensatory and punitive damages upon the further allegations “that people with disabilities are victimized much more readily by this brazen bureaucratic claim of unlimited jurisdiction” and that “this is the regular practice [of the OCME].”
Background
The limited reports and papers provided to the court on these motions disclosed the following relevant facts. The decedent, *759 who was 71 years of age at the time of his death, had been rendered a quadriplegic as result of a car accident in 19541 However, despite his disability and several admissions over the years to the Bronx Veterans Affairs Medical Center (for, among other things, coronary by-pass surgery, and an abdominal aortic aneurism repair) the decedent, prior to his final admission to the hospital on May 8, 1998, had been considered “high functioning” and “independent,” although wheelchair bound. On May 8th, after developing a blood clotting problem with his left arm and a urinary tract infection, he was admitted to the hospital and medicated and anti-coagulated. At some point thereafter it became necessary to transfer decedent to an intensive care unit (ICU) when he developed pneumonia and sepsis, complicated by a chronic obstructive pulmonary disease, all of which ultimately resulted in respiratory failure, multiple organ failure and death. Reports contained in the OCME record indicate that it was on August 28th, while in the ICU, that decedent developed an adult respiratory distress syndrome (ARDS), which required intubation[1] and that he thereafter became ventilator dependent. A most revealing entry in the OCME record (which has been conspicuously ignored by the defendant, both in its argument and in its recitation of the alleged facts) appears to indicate that death was anticipated by all family members and attending physicians. Apparently, after having been on the ventilator for a substantial period, with no hope for improvement and a worsening of his underlying illness, Junius Kellogg voluntarily chose not to be kept artificially alive. The OCME record contains a report, which was prepared and signed by Dr. Huang (the “Reporting Physician” from the Bronx Veterans Affairs Medical Center) in which he states, among other things, that, “Patient’s condition decompensated. ARDS. Patient expressed desire to be extubated. Discussed with family. Patient terminally weaned on 9/16. Patient remained comfortable/sedated.” No evidence submitted to the court on this motion provides any reasonable explanation as to why it was deemed necessary by the Bronx Veterans Affairs Medical Center to report this death to the Medical Examiner as one worthy of investigation or autopsy pursuant to applicable law.
Additional circumstances surrounding the death of the decedent Junius Kellogg (which are not denied by defendant) *760 are further described in an affidavit submitted by the decedent’s brother, plaintiff John Kellogg, who states that Junius Kellogg was on life support due to his failing heart condition, and that after discussion with his closest family members, he “expressed his desire to leave this world as peacefully as possible” and said “goodbye” to his family and asked to be extubated.
The autopsy report prepared by the Office of the Chief Medical Examiner provides the following cause and manner of death:
Cause of Death
Cause of Death: Atherosclerotic and Hypertensive Disease
Contributory: Respiratory and Gastrointestinal Complications of Quadriplegia Due to Remote Cervical Spine Injury
Manner of Death:[2] Accident (Passenger in Motor Vehicle Accident)
The autopsy report also provides a “final diagnosis” which supports the conclusion that a “severe atherosclerotic and hypertensive cardiovascular disease” was the primary cause of death!
Law Relating to Wrongs Committed to Dead Bodies
“It is a fundamental rule of statutory construction that a statute or legislative act is to be construed as a whole, and that all parts of an act are to be read and construed together to determine the legislative intent.” (McKinney’s Cons Laws of NY, Book 1, Statutes § 97.) Such statutes, especially when in derogation of the common law, must be read in conjunction with predecessor provisions, as well as with prior decisions which have interpreted them (Statutes §§ 221-223 [statutes in pari materia]). In New York City, the right provided to the OCME to investigate the circumstances of a death, and to conduct an autopsy, is purely statutory. That authority is incorporated in the New York City Charter (hereinafter, Charter), the Administrative Code of the City of New York (hereinafter, Administrative Code), and the Public Health Law. In this case, a historical analysis is particularly necessary, since a proper comprehension of the extent of the authority vested in the OCME cannot be fully appreciated without it.
*761 Unauthorized Autopsy
Private Cause of Action Not Recognized at Common Law
From the time of Sophocles’ “Antigone” in 442 B.C., there has existed a long cultural history concerning the treatment of the dead, which incorporates the concept that a wrong committed to the dead constitutes an affront to the living; and “disrespectful treatment of the body” will not be countenanced (Liberman v Riverside Mem. Chapel, 225 AD2d 283, 284-285 [1st Dept 1996]; 18 NY Jur 2d, Cemeteries and Dead Bodies, § 98). This concern for the treatment of the dead is reflected in Public Health Law § 4200 (1), which provides, “Except in the cases in which a right to dissect it is expressly conferred by law, every body of a deceased person, within this state, shall be decently buried or incinerated within a reasonable time after death.” (Derived from Penal Code § 306, added by L 1881, ch 676.)
Consequently, the rights and obligations of the living, and the duty to bury the dead have been long recognized and enforced. (See Patterson v Patterson, 59 NY 574, 583 [1875] [“So it would seem, at common law, that if a poor person of no estate dies, it is the duty of him under whose roof his body lies, to carry it, decently covered, to the place of burial”].) As early as 1854, an act of the Legislature entitled “Act to Promote Medical Science” (L 1854, ch 1) expressly prohibited the dissection of a dead body if the relatives or friends of the deceased made objection, or if they applied within a certain specified time for the release of the remains for the purposes of burial.
Surprisingly, despite the long cultural tradition pertaining to decedent burial, a private civil cause of action for unlawful dissection was not recognized at the common law. The prevailing principle, as expressed in the ecclesiastical law of England, was that the law did not recognize a property right in a dead body, and thus a wrong to the body itself was not actionable. (See Darcy v Presbyterian Hosp., 202 NY 259 [1911], rearg denied 203 NY 547 [1911].) Consistent with this theory, it was observed in Secor v Secor (Sup Ct, NY County, Oct. 1870, Pratt, J., reprinted following Johnston v Marinus, 18 Abb NC 72, 80, n [1886]) that, “An administrator cannot maintain an action for the negligent or wilful mutilation of the body of the deceased intestate, but he may sue for injury to the wearing apparel * * * Griffith v. Charlotte, etc., R. R. Co., 23 So. Car., 25; S. C., 55 Am. Rep., 1.”
Despite the lack of a common-law precedent for recovery for mutilation of a body, the courts in this country began to recog *762 nize such a cause of action in the latter half of the nineteenth century. The first New York case on the subject is Foley v Phelps (1 App Div 551 [1st Dept 1896]). In that case, the plaintiffs husband fell into an elevator shaft, and died approximately three hours after having been transported to Bellevue Hospital. It was alleged by plaintiff that an autopsy was performed without consent, and thus without any lawful authority. In recognizing that a cause of action existed, the Court observed that the right to possession of the body for burial carried with it the right to “possession of the corpse in the same condition it was in when death supervened” (at 555), and that the violation of that legal right gave rise to a private cause of action for damages. The right was not founded on a “property right” as such in the corpse, but instead, in the right to possess the corpse for the purpose of decent burial (at 555-556):
“The right is to the possession of the corpse in the same condition it was in when death supervened. It is the right to what remains when the breath leaves the body, and not merely to such a hacked, hewed, and mutilated corpse as some stranger, an offender against the criminal law, may choose to turn over to an afflicted relative. If this right exists, as we think it clearly does, the invasion or violation of it furnishes a ground for a civil action for damages. It is not a mere idle utterance, but a substantial legal principle, that wherever a real right is violated, a real remedy is afforded by the law.”
The decision in Foley was grounded, to some extent, on the “Minnesota rule” as set forth in Larson v Chase (47 Minn 307, 50 NW 238), which appears to have been the first case in the United States recognizing a cause of action for unlawful autopsy. (Supra at 554.) Both Larson (supra) and Foley (supra) were cited with approval, and their reasoning adopted, by the Court of Appeals in Darcy v Presbyterian Hosp. (202 NY 259 [1911], rearg denied 203 NY 547 [1911]).
Thus, the statutes which presently authorize the dissection of a body must be interpreted in conjunction with these foregoing authorities, all of which now recognize that an action will lie for the unauthorized conduct of an autopsy. These authorities and their progeny make abundantly clear that such an action is intended not only to compensate family members for the emotional and mental suffering occasioned by the improper *763 dissection of the decedent’s body (Beller v City of New York, 269 App Div 642; Grawunder v Beth Israel Hosp. Assn., 242 App Div 56, affd 266 NY 605), but also to provide punitive damages when egregious conduct accompanies such an autopsy (Lieberman v Riverside Mem. Chapel, supra).
Statutory Authority of Coroners or Other Officiants to Conduct Autopsies
The cause of action for unlawful autopsy must, of course, take into account the extent to which an autopsy is authorized by law, with or without the consent or objection of the next of kin. In Darcy (supra), the Court examined the various sections of the law which then applied, including Penal Law of 1909 § 2213 (now Public Health Law § 4210) and Penal Law of 1909 § 2214 (which then provided that “A person who makes, or causes or procures to be made, any dissection of the body of a human being, except by authority of law, or in pursuance of a permission given by the deceased, is guilty of a misdemeanor”). Darcy (supra) also considered the Consolidated Laws of the City of New York (L 1882, ch 410, § 1773), which (similar to the present New York City Charter) provided that the coroner in the City of New York was a public officer authorized to investigate the cause of death of any person who died “in a suspicious or unusual manner” (Darcy at 265). The Darcy Court, upon a review of the adequacy of the pleadings and the controlling statutory provisions, noted that an autopsy which is not specifically authorized by law constitutes a crime, and is civilly actionable.
The Statutory Framework in New York
The existing statutory scheme which authorizes the OCME to conduct autopsies in the City of New York is carefully and rigidly circumscribed. Clearly, “[t]he authority to conduct an autopsy derives solely from statute” (Bambrick v Booth Mem. Med. Ctr., 190 AD2d 646, 647 [2d Dept 1993]; Hendriksen v Roosevelt Hosp., 297 F Supp 1142), and no right to conduct an autopsy exists beyond that authorized by law. (Finley v Atlantic Transp. Co., 220 NY 249 [1917]; Liberman v Riverside Mem. Chapel, supra; Trammell v City of New York, 193 Misc 356 [Sup Ct, Kings County 1948].)
For the City of New York, the statutory scheme which authorizes an autopsy is incorporated in the New York City Charter and Administrative Code, as well as in the New York State Public Health Law. Together these provisions: (1) impose *764 a duty on persons to report certain deaths; (2) mandate the OCME to investigate such deaths, following the receipt of a report; and (3) provide the authority to conduct an autopsy. In addition, where the authority to conduct an autopsy exists, the law provides the next of kin with a limited right to make objection, and to request an exception, based on religious beliefs. Although these enactments provide OCME with a broad discretion to determine the necessity for an autopsy, that discretion is carefully circumscribed within long-standing and well-recognized bounds. (See Brown v Broome County, 8 NY2d 330; Cremonese v City of New York, 17 NY2d 22 [1966].) As stated in Brown, “[although the statutes * * * grant broad discretion to Coroners, the power is limited” to those instances when the statute permits the exercise of authority (8 NY2d, supra at 332). Consequently, while the OCME may exercise its sound judgment within the bounds which define its jurisdiction, the broad discretion of the OCME is not unfetteredl To coin a phrase, it is a “tethered discretion,” i.e., one which may be broadly exercised, however, only within the perimeter provided by the statutory “leash” to which it is attached. Therefore, when this discretion is exercised within that arena provided by statute, the courts will, and should, provide broad deference to the decision by the OCME to dissect. As stated in Cremonese (supra at 26), “The city is not liable for official decisions of the medical examiner within the frame of his statutory authority.” (Emphasis supplied.) However, when the OCME is unable to adequately articulate how the decision to dissect is somehow related to the authority provided by statute, the City and OCME are and should be liable. An in-depth examination of the statutory authority as well as the restraints and curbs imposed therein, becomes imperative. An examination of that authority reveals the following duties, obligation and limitations.
Duty of Citizen to Report
Citizens of the City of New York generally are charged with a duty to report those deaths which fall within the parameters of Charter § 557 (f) (infra) (Administrative Code § 17-201; wilful neglect or refusal to report such death is made a misdemeanor). In this action, the duty to investigate the death of Junius Kellogg was initially triggered by a report from an employee (not a physician) at the Bronx Veterans Affairs Medical Center. However, nothing in the record which has been submitted to this court sufficiently explains why this employee *765 deemed it necessary to report this death to the OCME. In any event, despite the fact that this report did not indicate that Kellogg’s death was “unexpected,” or “sudden” or “unusual,” the report, in and of itself, triggered an obligation by OCME to investigate.
Obligation of Medical Examiner to Investigate
Upon receiving a report of death, OCME is not only authorized, but in fact obligated by the Administrative Code, to “fully investigate” the circumstances of the death in order to determine if there was evidence of criminality, malfeasance or other cause warranting autopsy. (See Administrative Code § 17-202 [entitled “Procedure in deaths reportable to the (OCME)”].) However, it would be erroneous to equate the duty to investigate with the authority and discretion to conduct an autopsy. The statutes clearly illustrate that the right to conduct an autopsy is more limited. Indeed, in many cases it would be reasonable to suppose that after investigation, no autopsy is warranted. (See Administrative Code § 17-203, infra.) The Administrative Code together with Charter § 557 make clear that the right to conduct an autopsy arises only in those circumstances when, subsequent to investigation, it would appear that death occurred in an unusual manner, indicative of criminality or suicide or under suspicious circumstances.
Limited Authority to Conduct Autopsy
The limited statutory authority to dissect a body and to conduct an autopsy is set forth in the following sections of the Public Health Law and the New York City Charter:
“[Charter] § 557 Chief medical examiner * * *
“(f) The chief medical examiner shall have such powers and duties as may be provided by law in respect to bodies of persons dying from criminal violence, by casualty, by suicide, suddenly when in apparent health, when unattended by a physician, in a correctional facility or in any suspicious or unusual manner or where an application is made pursuant to law for a permit to cremate the body of a person.” (Emphasis supplied.)
“[Public Health Law] § 4210. Cadavers; right to dissect.
“The right to dissect the body of a deceased person exists in the following cases:
“1. In the cases prescribed by special statutes; or,
“2. When the dissection is performed by or at the *766 direction of* * * (c) a medical examiner of a county * * * and is performed in the course of an investigation within the jurisdiction of the officer performing or directing the dissection.”
The conditional authority provided by the above statutes is further circumscribed by Administrative Code § 17-203, which provides, “If the investigation of the circumstances and examination of the body enable the medical examiner or medical investigator to conclude with reasonable certainty that death had occurred from natural causes or obvious traumatic injury, and there are no other circumstances which would appear to require an autopsy, the medical examiner or medical investigator in charge shall certify the cause of death and file a report of his or her findings in the office of chief medical examiner.” (Emphasis added.) In other words, if the Chief Medical Examiner can reasonably determine, as appears in this case, that death was from natural causes he is mandated to certify the death and file a report without an autopsy.
As an exclamation to the limited authority provided by the above statutes, the Public Health Law makes it a “misdemean- or” for a person to cause or to conduct an autopsy “except by authority of law or in pursuance of a permission given by the deceased.” (Public Health Law § 4210-a [“Unlawful Dissection of a Body of a Human Being”].) Moreover, this “tethered discretion” is even subject to the restraint of a further limited exception.
Limited Exception Based on Religious Beliefs
Even where authority clearly exists to conduct an autopsy, article 42 of the Public Health Law, in recognition of the concerns of next of kin, provides a limited exception to OCME’s right to dissect. Section 4210-c (1) of the Public Health Law states that “in the absence of a compelling public necessity, no dissection or autopsy shall be performed over the objection of a surviving relative or friend of the deceased that such procedure is contrary to the religious belief of the decedent, or, if there is otherwise reason to believe that a dissection or autopsy is contrary to the decedent’s religious beliefs.”
Discussion and Conclusion
Based on the foregoing cases and statutes, although the Medical Examiner was required to investigate the circumstances of Junius Kellogg’s death, it appears, upon the incomplete record presented, that he was not authorized to *767 conduct the autopsy because the cause of death was clearly due to natural causes (Administrative Code § 17-203, supra). In an attempt to establish a factual basis for the argument that the death was in some way unusual or unexplained, the defendant refers, without elaboration, to the notes of the physicians who participated in the care of the decedent, and to a suspicion that the 44-year-old car accident and resultant quadriplegia contributed to Kellogg’s death. It is well established that the proponent of a motion for summary judgment carries the initial burden of production of evidence as well as the burden of persuasion. (Alvarez v Prospect Hosp., 68 NY2d 320 [1986].) Clearly, in this case, the defendant has not tendered sufficient evidence from which it can be found that an autopsy was authorized. In fact, to a person not trained in the medical arts the contrary would appear to be the case.
Far from establishing that Junius Kellogg’s death was sudden, unusual or unexplained, the medical records in fact appear to support the opposite conclusion. The scenario depicted by the medical records portrays an elderly man, with an extensive history of health problems, whose health deteriorated due to natural causes, and who bravely declined further treatment in favor of a more dignified passing. In this regard, the court observes that there is no factual dispute that the decedent was competent, and that he freely declined continuing further invasive medical treatment which did no more than artificially prolong his life. The court is cognizant of the well-established common-law right of individuals to decline medical care. (Matter of Storar, 52 NY2d 363 [1981]; Matter of Erickson v Dilgard, 44 Misc 2d 27; Matter of Melideo, 88 Misc 2d 974; Public Health Law §§ 2504, 2805-d; CPLR 4401-a.)
In addition, this court must express its grave concern (albeit founded on a silent record which supplies no ready explanation for the conduct of the autopsy) that a patient’s exercise of his or her right to decline further invasive life-sustaining procedures not be taken as a carte blanche for dissection after death. As stated succinctly by Judge Cardozo in Schloendorff v Society of N. Y. Hosp. (211 NY 125, 129 [1914]), “Every human being of adult years and sound mind has a right to determine what shall be done with his own body.” The right of a patient to control the course of his or her medical treatment is embodied in the statutory law of this state (see Public Health Law §§ 2504, 2805-d; CPLR 4401-a), and this right extends even to the point in time when a patient who has made such a choice by clear and convincing evidence is rendered *768 incompetent. (Matter of Eichner v Dillon, 52 NY2d 363.) This court does not believe that the exercise of the right of an individual to decline life-saving medical treatment carries with it the threat of dissection after death. Without the presence of other circumstances warranting an autopsy, the exercise of a patient of the right to die does not in itself constitute an unusual circumstance warranting an autopsy. This court could hardly recognize a routine right to autopsy a body when death is the result of a conscious decision of the deceased to decline further treatment, when the surrounding circumstances are otherwise indicative of death by natural causes. To do so would constitute unnecessary and inappropriate response to the exercise of a right long recognized in law.
In short, this court can discern no basis for conducting an autopsy on the papers submitted. However, the court does not grant summary judgment in favor of the plaintiff on the first cause of action only because the record is incomplete and the court believes that, absent the full hospital chart and perhaps expert analysis thereof, none of which has been provided, it is inadvisable at this time to arrive at a conclusive determination.
In this case the defendant argues that the mere absence of objection to the autopsy by the next of kin provided the authorization for the City to perform an autopsy; and the City argues that the failure to even plead that an objection was made requires dismissal of the complaint. The City’s argument concerning the meaning and applicability of Public Health Law § 4210-c is misleading and misapplied in the context of this case. There is, in view of the statutory scheme, no requirement that plaintiff plead or establish that an objection was made prior to the autopsy, or that an objection was communicated to the OCME, in order to recover for an unauthorized dissection of the body. (See Cremonese v City of New York, supra; Darcy v Presbyterian Hosp., supra; Burke v New York Univ., 196 App Div 491, 494 [“it was for the defendant to plead the facts which justified such a dissection”]; Trammell v City of New York (193 Misc 356 [Sup Ct, Kings County 1948].) It is only necessary for the plaintiff in a case of this kind to plead and prove that the plaintiff did not consent to the autopsy — a matter entirely different from pleading and proving that the plaintiff voiced an objection to the autopsy. It is only when the OCME has proper authority in the first instance to perform an autopsy (pursuant to Charter § 557 [f] and Public Health Law § 4210) that section 4210-c has any relevance or significance. Section 4210-c merely provides a further limitation on the prior statutory authority of *769 a Medical Examiner to conduct an autopsy, and it was not intended to provide a “loophole” for an unauthorized autopsy.
Lastly, the court notes that the answer interposed by the defendant City of New York contains only a general denial and that the supporting papers on this motion are supported by legal conclusions rather than evidentiary facts (Trammell v City of New York, 193 Misc 356 [Sup Ct, Kings County 1948] [an affirmative defense, which set forth legal conclusions rather than the evidentiary facts supporting the defense that the autopsy was authorized by law, was insufficient and should be stricken]). As stated above it has been held that the defendant must plead an affirmative defense alleging sufficient facts to establish that the autopsy was authorized.
Here, the issue of the reasonableness of the autopsy should not be determined on the record presented. In addition, this court is also much concerned that mere medical curiosity over decedent’s long-standing quadriplegia may have been the sole motivating factor in the decision to conduct an autopsy. If so, such a selfish motivating factor may provide a prima facie basis for cause of action which is based on unlawful discrimination. The parties are therefore afforded the opportunity to consider further discovery on all issues, and to submit the full hospital chart and expert evidence as to whether or not the circumstances surrounding the death of the decedent were sufficiently sudden or unusual to permit the dissection of Junius Kellogg.
The defendant’s motion is denied without prejudice to renew and reargue upon a sufficient record, and the request by plaintiff to search the record and grant summary judgment in plaintiffs favor on the first cause of action is similarly denied without prejudice.
[Portions of opinion omitted for purposes of publication.]

. Intubation, requires the insertion of a tubular device into the nasotracheal tube in order to provide anesthesia and/or control for pulmonary ventilation.

. Attributing the “manner of death” to an automobile accident appears at this juncture to be a pretextual attempt to satisfy the requirements of the New York City Charter since the only motor vehicle accident revealed by the record is the 1954 accident, which certainly was not the proximate cause of death.