[886 NYS2d 714]

Gladys Frankson, Respondent, v Brown & Williamson Tobacco Corporation et al., Appellants.

Second Department, September 29, 2009

### APPEARANCES OF COUNSEL

*Chadbourne & Parke LLP*, New York City (*Thomas E. Riley, Benjamin C. Rubinstein, Ellen A. Black, Morghan Richardson* and *Cassandre L. Charles* of counsel), for Brown & Williamson Holdings, Inc., and another, appellants, and *Seward & Kissel LLP*, New York City, for Tobacco Institute, Inc., appellant (one brief filed).

*Douglas & London, P.C.*, New York City (*Michael A. London, Gary J. Douglas* and *Kenneth J. Gorman* of counsel), and *Bauman Kunkis & Ocasio-Douglas, P.C.*, New York City, for respondent (one brief filed).

### OPINION OF THE COURT

ENG, J.

The late Harry Frankson began smoking cigarettes in 1954, when he was 13 years old. Frankson soon became a heavy smoker, smoking at least a pack of cigarettes a day over the next 40 years. The brand Frankson regularly smoked throughout his life was Lucky Strikes, originally manufactured by the American Tobacco Company (hereinafter American), and after 1995 by its successor, the Brown & Williamson Tobacco Corporation (hereinafter Brown & Williamson). Frankson was diagnosed with lung cancer in September 1998 and died five months later, at the age of 57. It is undisputed that Frankson's lung cancer was caused by smoking American's Lucky Strike cigarettes.

Following Frankson's death, his widow, Gladys Frankson, commenced this action against Brown & Williamson, individually and as successor by merger to American. Also named as defendants were the Tobacco Institute, Inc. (hereinafter the Tobacco Institute), a nonprofit trade organization formed in 1954, and the Council for Tobacco Research-USA, Inc. (hereinafter the Tobacco Council), a tobacco-company-sponsored organization formed that same year to fund research on smoking and health. The plaintiff sought damages on theories, inter alia, that the defendants had fraudulently concealed the health risks of smoking prior to 1969, and had conspired to fraudulently conceal these risks. The plaintiff also asserted several defective design claims against the defendants.

After a four-week trial conducted in late 2003, the jury returned a verdict finding American liable for having fraudulently concealed the health risks of smoking prior to 1969, and all of the defendants liable for conspiracy to fraudulently conceal these risks. The jury attributed 10% of the fault on the fraudulent concealment and conspiracy claims to American, 5% to Brown & Williamson, 10% to the Tobacco Institute, and 10% to the Tobacco Council. In addition, the jury found American 15% at fault on the design defect claims. The jury apportioned the remaining 50% of fault to Frankson, and awarded compensatory damages in the sum of $350,000. The jury also expressly found that the defendants' conduct was so wanton, reckless, or malicious as to warrant the imposition of punitive damages. A trial on the issue of punitive damages then ensued, culminating in a jury verdict awarding the plaintiff the sum of $20 million. The jury apportioned $2 million of the punitive damages award against American, $6 million against Brown & Williamson, $6 million against the Tobacco Institute, and $6 million against the Tobacco Council.

The defendants moved pursuant to CPLR 4404 (a) for a new trial or, in the alternative, to either strike the punitive damages award or reduce the amount of that award to comport with due process. In support of their motion, the defendants argued, among other things, that the jury verdict in favor of the plaintiff should be set aside because the trial court had applied an erroneous standard for the admission of scientific evidence, which had prevented them from showing that they relied upon the views of leading authorities in the 1950s in concluding that there was no established link between smoking and lung cancer. The defendants further contended that the plaintiff had failed to present legally sufficient evidence to support her design defect claims. In addition, the defendants claimed that punitive damages should not have been assessed against the Tobacco Institute and the Tobacco Council because these entities were no longer in existence, and that the amount of the award exceeded the constitutionally permissible ratio between compensatory and punitive damages. In three separate orders dated June 22, 2004, the trial court granted the defendants' motion only to the extent of directing a new trial on the issue of punitive damages unless the plaintiff stipulated to reduce the punitive damages award to $5 million, which was to be apportioned $4 million against Brown & Williamson, $500,000 against the Tobacco Institute, and $500,000 against the Tobacco Council. The plaintiff agreed to so stipulate.

Thereafter, the defendants appealed from stated portions of the three orders, raising numerous arguments, which included a claim that the plaintiffs had failed to present legally sufficient evidence to prove that the defective design of the cigarettes smoked by Frankson was a proximate cause of his injuries. The defendants also challenged the trial court's standard for the admission of scientific evidence, and continued to maintain that punitive damages should not have been assessed against the Tobacco Institute and Tobacco Council because the assessment of damages against defunct entities served no deterrent value. With respect to the issue of punitive damages, the defendants briefly contended that during the punitive damages trial the court had improperly permitted the plaintiff's attorney to make arguments that had no nexus to the decedent's injuries, including a statement that the defendants' actions had caused the death of thousands of other citizens of the State of New York. The defendants further maintained that the trial court had improperly instructed the jury that it could consider evidence of

conduct by the defendants which did not directly cause or contribute to Frankson's injuries if such evidence would help "shed light on the defendant's motivation for acting the way they did, towards any New York State smokers, and particularly Mr. Frankson." In a decision and order dated July 6, 2006, this Court modified one of the three orders appealed from by granting that branch of the defendants' motion which was to set aside the jury verdict in favor of the plaintiff on her defective design claims, noting that she had explicitly elected not to oppose the defendants' argument that these claims were not supported by legally sufficient evidence (see *Frankson v Philip Morris Inc.*, 31 AD3d 372, 374 [2006]). However, this Court rejected all of the defendants' remaining contentions.

Following this Court's modification, and additional motion practice, on June 26, 2007 judgment was entered in favor of the plaintiff and against the defendants, awarding the plaintiff compensatory damages in the principal sum of $175,000 ($350,000 reduced by the jury's 50% apportionment of culpability against Frankson), and punitive damages in the principal sum of $5 million.

On appeal from the judgment, the defendants rely upon the United States Supreme Court's February 20, 2007 decision in *Philip Morris USA v Williams* (549 US 346 [2007]) to support their argument that the punitive damages award should be set aside because the jury was not properly instructed that it could not award such damages to punish the defendants for harm to other smokers. In addition, the defendants continue to challenge the trial court's standard for the admission of scientific evidence, and to contend that punitive damages should not have been assessed against the Tobacco Institute and the Tobacco Council. The plaintiff responds by arguing, as a threshold procedural issue, that all of the defendants' claims are barred by the doctrine of law of the case.

As a general rule, the law of the case doctrine precludes this Court from reexamining an issue which has been raised and decided against a party on a prior appeal where that party had a full and fair opportunity to address the issue (see *People v Evans*, 94 NY2d 499, 502 [2000]; *Allison v Allison*, 60 AD3d 711 [2009]; *Lipp v Port Auth. of N.Y. & N.J.*, 57 AD3d 953, 954 [2008]; *Town of Massena v Healthcare Underwriters Mut. Ins. Co.*, 40 AD3d 1177, 1179 [2007]). Unlike res judicata and collateral estoppel, which "are rigid rules of limitation," the law of the case doctrine "is a judicially crafted policy that 'expresses

the practice of courts generally to refuse to reopen what has been decided, [and is] not a limit to their power' " (*People v Evans,* 94 NY2d at 503, quoting *Messenger v Anderson,* 225 US 436, 444 [1912]). Thus, while the law of the case doctrine is intended to foster "orderly convenience" (*Foley v Roche,* 86 AD2d 887, 887 [1982]), it is not an absolute mandate which limits an appellate court's power to reconsider issues where there are extraordinary circumstances, "such as subsequent evidence affecting the prior determination or a change of law" (*Lipp v Port Auth. of N.Y. & N.J.,* 57 AD3d at 954; *see People v Evans,* 94 NY2d at 503; *J-Mar Serv. Ctr., Inc. v Mahoney, Connor & Hussey,* 45 AD3d 809 [2007]; *Foley v Roche,* 86 AD2d at 887).

▆ Guided by these principles, we agree that the law of the case doctrine precludes us from reconsidering the issues of whether the trial court applied an appropriate standard for the admissibility of scientific evidence, and whether punitive damages were properly assessed against the Tobacco Institute and the Tobacco Council. These issues were raised by the defendants and decided against them on the prior appeals, and there are no new factual circumstances or change in the law which would warrant our reconsideration (*see Pekich v James E. Lawrence, Inc.,* 38 AD3d 632, 633 [2007]; *Quinn v Hillside Dev. Corp.,* 21 AD3d 406, 407 [2005]; *Wendy v Spector,* 305 AD2d 403 [2003]).

▆ We reach a different conclusion, however, with respect to the defendants' argument that the punitive damages award should be set aside because the jury was not properly instructed that it could not award such damages to punish the defendants for harm to other smokers. Although the defendants briefly addressed the propriety of the trial court's punitive damages charge on the prior appeals, the related and more expansive arguments they now raise are based upon the United States Supreme Court's decision in *Philip Morris USA v Williams* (549 US 346 [2007]), which was decided after the determination of the prior appeals, but before entry of the judgment against the defendants. Since *Philip Morris* offers substantial guidance and clarification regarding the limited manner in which a jury may consider harm to nonparties in assessing punitive damages, we find that it constitutes a change in the law which makes reconsideration of the propriety of the punitive damages charge appropriate in this case (*see Lipovsky v Lipovsky,* 271 AD2d 658 [2000]; *Foley v Roche,* 86 AD2d 887 [1982]).

In contrast to compensatory damages, which are intended to redress the concrete loss that a plaintiff has suffered by reason

of the defendant's wrongful conduct, punitive damages are essentially private fines levied by civil juries to punish reprehensible conduct, and deter its future occurrence (*see Cooper Industries, Inc. v Leatherman Tool Group, Inc.,* 532 US 424, 432 [2001]; *Gertz v Robert Welch, Inc.,* 418 US 323, 350 [1974]). Thus, a jury's assessment of punitive damages serves as "an expression of its moral condemnation" (*Cooper Industries, Inc. v Leatherman Tool Group, Inc.,* 532 US at 432). Although states possess considerable discretion over the imposition of punitive damages, the United States Supreme Court has emphasized that there are constitutional limitations on such awards, and that the Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments upon a tortfeasor (*see Cooper Industries, Inc. v Leatherman Tool Group, Inc.,* 532 US at 432; *BMW of North America, Inc. v Gore,* 517 US 559, 562 [1996]). In *BMW*, the Court identified three guideposts for determining whether a punitive damages award is so grossly excessive that it violates due process. These guideposts are: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. Applying these guideposts several years later in *State Farm Mut. Automobile Ins. Co. v Campbell* (538 US 408, 429 [2003]), the Court concluded that a $145 million punitive damages award imposed against State Farm Mutual Automobile Insurance Company (hereinafter State Farm) for the bad-faith failure to settle a lawsuit, where the compensatory damage award was $1 million, was "neither reasonable nor proportionate to the wrong committed," and thus violated due process. Notably, in evaluating the reprehensibility of State Farm's conduct, the Court concluded that the award had been improperly based upon out-of-state conduct which may have been lawful in the jurisdiction where it occurred, and which had no nexus to the specific harm suffered by the plaintiff (*see State Farm Mut. Automobile Ins. Co. v Campbell,* 538 US at 429).

The United States Supreme Court subsequently expanded upon the rationale of *State Farm* in *Philip Morris*. In that case, the widow of a smoker who died of lung cancer sued the tobacco company which had manufactured the brand of cigarettes he smoked, alleging that her late husband, Jesse Williams, had

smoked in significant part because he thought it was safe to do so, and that the tobacco company had knowingly and falsely led him to believe that this was so. A jury found that Williams's death had been caused by smoking, and that Philip Morris was negligent and had engaged in deceit. With respect to the deceit claim, the jury awarded compensatory damages in the sum of $821,000, and punitive damages in the sum of $79.5 million. The trial court found the $79.5 million punitive damages award "excessive," and reduced it to $32 million. On appeal, the Oregon Court of Appeals restored the punitive damages award. Philip Morris sought review in the Oregon Supreme Court, which, denied review, and then in the United States Supreme Court. The United States Supreme Court remanded the case to the Oregon Court of Appeals for further consideration in light of its determination in *State Farm*. After the Oregon Court of Appeals adhered to its determination reinstating the $79.5 million punitive damages award, Philip Morris sought and obtained review in the Oregon Supreme Court. In that court, Philip Morris argued that the trial court should have granted its request to charge the jury that it could not seek to punish the company for injury to other persons not before the court. In support of its argument, Philip Morris pointed out that the plaintiff's attorney had told the jury to "think about how many other Jesse Williams in the last 40 years in the State of Oregon there have been . . . Cigarettes . . . are going to kill ten [of every hundred]." The Oregon Supreme Court rejected Philip Morris's argument, and the United States Supreme Court granted certiorari.

In vacating the Oregon Supreme Court's judgment and remanding the case for further proceedings, the United States Supreme Court held that "the Constitution's Due Process Clause forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties or those whom they directly represent, i.e., injury that it inflicts upon those who are, essentially, strangers to the litigation" (*Philip Morris USA v Williams*, 549 US at 353). In so holding, the Court expressed concern that allowing punishment for injury to a nonparty would deprive a defendant of an opportunity to show, for example, that the other victim was not entitled to damages because he or she knew that smoking was dangerous or did not rely upon the defendant's statements to the contrary. Moreover, "to permit punishment for injuring a nonparty victim would add a near standardless

dimension to the punitive damages equation" by allowing the jury to speculate as to matters such as how many other victims existed, and how seriously those victims had been injured (*Philip Morris USA v Williams,* 549 US at 354). Although the Court concluded that punitive damages could not be used to punish a defendant directly for harm inflicted on nonparties, it also recognized that a showing of harm to others was relevant to the portion of the punitive damages constitutional equation, which requires the jury to gauge the reprehensibility of the defendant's conduct. Since conduct that risks harm to many is likely to be more reprehensible than conduct that risks harm to only a few, the Court concluded that a jury may take this fact into account in determining reprehensibility. However, the Court emphasized that it was constitutionally important that juries be given proper legal guidance to provide assurance "that juries are not asking the wrong question, i.e., seeking, not simply to determine reprehensibility, but also to punish for harm caused strangers" (*Philip Morris USA v Williams,* 549 US at 355).

■ Here, the plaintiff's counsel made repeated references during the liability and compensatory damages phase of the trial to the fact that thousands of people die each year from lung cancer, and alleged that tobacco companies had created this lung cancer epidemic. Moreover, in delivering his summation during the punitive damages phase of the trial, the plaintiff's counsel asked the jury to consider "[w]hat's the harm here? Broken pinkie? It's death. It's the ultimate harm. It's loss of life we're talking about. By the tens of thousands, not just Mr. Frankson." Although the plaintiff's counsel followed this comment almost immediately with a statement that the defendants' "reprehensibility has to be judged in the context of the world in which they committed the reprehensibility," this statement did not clearly signal to the jury that it should consider the death of thousands of others only in assessing the reprehensibility of the defendants' conduct. Thus, absent a proper limiting instruction, the jury could have mistakenly understood the plaintiff's argument that the defendants' conduct resulted in the death of thousands of people to justify taking those other deaths directly into account in calculating the amount of damages warranted to punish the defendants' reprehensible conduct (*see White v Ford Motor Co.,* 500 F3d 963, 972 [2007]). Despite this danger, the trial court did not accept the defendants'

request to charge the jury that "you are not to impose or assess punitive damages for injuries to any person other than the plaintiff."

Furthermore, the instructions which the trial court gave did not provide adequate assurance that the jury's punitive damage award was not intended to directly punish the defendants for harm caused to other smokers in New York. In this regard, the court instructed the jurors that they could consider evidence of conduct by the defendants which did not directly contribute or cause Frankson's injuries "insofar as it may shed light on the defendant's motivation for acting the way they did, towards any New York State smokers, and particularly Mr. Frankson." The court also instructed that "[y]ou may not impose punitive damages to punish a defendant for other people outside the State of New York, but only conduct which reflects on the state smokers and its population, as well as Mr. Frankson." Taken together, these instructions could well have misled the jury into believing that it could impose punitive damages for harm to other smokers, provided that those other smokers also resided within the State of New York (*see White v Ford Motor Co.,* 500 F3d at 972). We are mindful that this is an evolving area of the law, and that the trial court did not have the benefit of the Supreme Court's guidance in *Philip Morris* in formulating its punitive damages charge. However, in order to ensure that the punitive damages award in this case comports with due process considerations, this intervening precedent compels us to modify the judgment to set aside the punitive damages award, and to remit this matter to the Supreme Court, Kings County for a new trial on that issue. Therefore, the judgment is modified, on the law, by deleting the provision thereof awarding punitive damages in the sum of $5 million; as so modified, the judgment is affirmed insofar as appealed from, and the matter is remitted to the Supreme Court, Kings County for a new trial on the issue of punitive damages, and the entry of an appropriate amended judgment thereafter.

Spolzino, J.P., Santucci and Angiolillo, JJ., concur.

Ordered that the judgment is modified, on the law, by deleting the provision thereof awarding punitive damages in the sum of $5 million; as so modified, the judgment is affirmed insofar as appealed from, without costs or disbursements, and the matter is remitted to the Supreme Court, Kings County, for a new

trial on the issue of punitive damages, and the entry of an appropriate amended judgment thereafter.

Motion by the respondents to dismiss an appeal from a judgment of the Supreme Court, Kings County entered June 26, 2007, which was referred to the panel of Justices hearing the appeal for determination upon the argument or submission thereof.

Upon the papers filed in support of the motion and the papers filed in opposition thereto, and upon the argument of the appeal, it is ordered that the motion is denied.

SPOLZINO, J.P., SANTUCCI, ANGIOLILLO and ENG, JJ., concur.