OPINION OF THE COURT Webber, J. In these two consolidated wrongful death actions arising out of the catastrophic crane collapse on East 91st Street in Manhattan on May 30, 2008, defendants New York Crane & Equipment Corp. (NY Crane), J.F. Lomma, Inc. (JF Lomma), and James F. Lomma (Lomma) (collectively referred to as defendants) appeal from a judgment awarding plaintiff Leo $7.5 million for the preimpact terror and $8 million for the pain and suffering of her decedent, and $24 million in punitive damages as against them, and from a judgment awarding plaintiff Kur-taj $7.5 million for preimpact terror, $24 million for pain and suffering, and $24 million in punitive damages as against them. Defendants argue that the trial court erred in allowing the jury to pierce the corporate veils of NY Crane and JF Lomma, subjecting Lomma to personal liability, and in precluding defendants’ expert witness James Wiethorn from testifying, and that the jury’s awards should be set aside as excessive. The trial in this matter lasted some 11 months. More than 87 witnesses were called to testify. The facts as elicited are essentially the following: On May 30, 2008, a 34-story building complex that was to include residential units, office space, and a public middle school was under construction at 331-333 East 91st Street in Manhattan. Leon D. DeMatteis Construction Corporation (DeMatteis) was hired to act as the construction manager, and Sorbara Construction Corp. (Sorbara) was hired to construct the building’s concrete superstructure. Sorbara leased a crane from defendant NY Crane, a company owned by Lomma.[1] The crane was a Kodiak tower crane with four main components: a tower, a cab, a boom, and a counterweight assembly. At the time of the accident, the tower was 205 feet high, and was attached to the building under construction at the ninth floor. The cab, within which sat plaintiff Leo’s decedent, Donald Leo, as the operator, the 160-foot boom (or arm that extended out to hoist materials), and the counterweight arm that extended in the opposite direction from the boom all rested upon a turntable assembly that connected those elements to the tower while allowing them to rotate. One of the main components of the turntable assembly was a 69-inch diameter bearing (or slewing) ring that effectuated rotation of the assembly. Hoist lines ran from the counterweight assembly arm through the top of the boom, and then hung down from the boom tip over a rotating disc called a sheave. That portion of the hoist line hanging from the boom tip, i.e., the lifting line, terminated at a hook, directly above which sat a “headache ball” (also referred to as a header ball), a heavy ball used as ballast to keep the lifting line taut. Sometime in 2007, before being used on the subject project, the crane’s bearing ring, which was denoted “turntable 052,” developed a crack while at another site and required replacement. NY Crane attempted to obtain a replacement from the manufacturer of the original turntable, and was informed that it would cost $34,000 and take one year, unless NY Crane paid an additional $120,127 to expedite its manufacture within 28 weeks. At that time there was a waiting list for the company’s cranes, and Sorbara had begun the project using a cherry picker while waiting for a crane to become ready. The testimony was that Lomma directed one of his employees, a mechanic with no technical expertise, to locate an alternate source. The employee, through a Google Internet search, was able to locate a China-based company, “RTR Bearing Company Limited” (RTR), that said it would create the bearing ring for $20,000. Lomma testified that because NY Crane had never used RTR before, he “asked to see if they were ISO [International Organization for Standardization, an international nongovernmental organization that publishes safety standards] certified and . . . asked for some references” and “other stuff [he just couldn’t] remember.” Lomma also contacted one of RTR’s clients to confirm that it had purchased a bearing ring from RTR. According to Lomma, he had no direct contact with RTR; contact was only through his employees. Lomma did receive a brochure that said that RTR had ISO certification. Attached to the brochure was the business card of Joyce Wang. Lomma testified that he assumed that Wang worked for an engineering firm and that RTR had engineers on staff. In fact, neither Wang nor anyone at RTR was an engineer, and RTR was not a manufacturer but a broker/distributor that subcontracted its work out to factories in China. Lomma admitted that he was aware that if a turntable bearing ring failed, it would have catastrophic results, creating a mortal risk to the operator, other workers, and the general public. Neither NY Crane nor Lomma had drawings for the bearing ring that required replacement. Drawings of a different bearing from the subject bearing’s original manufacturer were forwarded to RTR. Handwritten notes were then added to the drawings to indicate the differing dimensions of the desired replacement bearing. Following receipt, Joyce Wang of RTR emailed NY Crane the following: “Just discussed with our general engineer, and we think the information I gave below is not right. He said we once had done this likely bearing also use in crane, it should be the whole bend ring weld on the bearing. But last time we did only the bearing and didnt weld and customer weld itself, he said because in the crane it is a very important part, and we are afraid the weld technic we had is not good, because normally we didnt do like that. And honest speaking we dont have confidence on this welding. So he suggest if you can weld the bend yourself, and we supply the slewing bearing without holes in inner ring. Is that OK? If still need us to do, please advise the material of the bend and dimension of it [sic].” In response, Lomma’s employee sent Wang a drawing with some general information from the manufacturer regarding welds. After NY Crane agreed to a price increase of $1,710, Wang responded, “We can do this.” The testimony was that there were back-and-forth emails between Wang and NY Crane indicating confusion on RTR’s part as to the bearing’s specifications.[2] Notably, RTR was never provided engineering drawings. It received graphics or “cartoons” produced using Microsoft Paint that illustrated what the bearing should look like. The testimony was that RTR also was never informed of the type of load the bearing would be subjected to. Lomma testified that while he knew of the email from RTR stating that it did not have confidence in its welding technique because it was “not good,” he decided to allow RTR to weld, because it ultimately said it could. He admitted that he was aware that the bearing’s components, i.e., balls and spacers, were of a different size and number than those in the bearing being replaced. Lomma also admitted that he was aware that before the crane could be used again, any new bearing was subject to certification by the New York City Department of Buildings (DOB) that it met the original manufacturer’s specifications for safety. During the process of obtaining the RTR bearing, Lomma contacted engineers to “get their take” on the bearing, as well as to see whether they would sign off on it for the DOB certification. None of the engineers contacted would agree to certify the new bearing. Lomma testified that despite the fact that he was not an engineer, welder or other specialist, he personally certified its compliance. Upon receipt, the new bearing was tested to ensure that the steel used by RTR met industry requirements. According to the testimony, Lomma never had the weld tested to see if it met the size dimensions in the specifications. Brady Marine Repair Co. (Brady Marine) was engaged by NY Crane to remove the damaged part and weld the new RTR ring. In turn, Brady Marine hired Branch Radiographics to check Brady Marine’s welds by ultrasonic testing. Lomma testified that he did not know whether Brady Marine had the RTR welds X-rayed. The owner of Brady Marine testified that Brady Marine would not test welds other than its own unless the customer specifically requested it. Apparently, Lomma did not request that the RTR welds be tested. Lomma was ultimately contacted by DOB informing him that DOB required inspection of the damaged bearing before NY Crane repaired it or put the crane back in service. DOB also required certification that any replacement parts met or exceeded the manufacturer’s original specifications. Lomma testified that he contacted a former NY Crane employee now working at DOB and informed him that the Kodiak crane had been “repaired” with a new bearing, and that ultrasonic testing had been performed. This former NY Crane employee, in an admitted breach of DOB protocol, visually inspected the crane and performed a checklist of its components. The testimony was that DOB protocol was not to test any of the components, including the RTR welds, but rather only to look for obvious defects. The crane was erected on April 19 and 20, 2008. Once erected, it passed DOB testing, meaning that all safety devices on the crane functioned properly, including those designed to prevent improper crane operation. In terms of safety devices, the testimony at trial was that the crane was equipped with three devices that prevented the operator from performing unsafe maneuvers, including high booming and raising the angle of the boom to an unsafe level. A computer, which could only be modified or disabled by NY Crane’s chief mechanic, would sound a buzzer if the boom were within a degree of its upper limits. Physical safety limit switches were also installed by NY Crane, and if the computer did not stop an operator from high booming, a switch on the side of the crane’s A-frame would prevent the boom from being raised higher than 78 degrees by shutting down the crane’s engine. The crane had a third device, a physical stop called a “boom stop,” which acted like a physical bumper to prevent a boom from moving beyond 80 degrees. The crane also had safety devices to prevent two-blocking, or bringing the line up too fast and far, causing the “headache ball” to strike the tip of the boom, and creating a risk of the boom suddenly moving upward until the crane flipped over backwards. A computerized system would trigger an alarm if the headache ball was close to the cut-off limit to the boom tip. In addition, a physical limit switch (called an A2B switch) was attached by a bracket on the hoist line, and would physically stop the load line from being reeled in too far, and prevent the headache ball from striking the boom tip. Like the anti-high-boom devices, the anti-two-blocking devices were installed and programmed by NY Crane. There was testimony that the crane’s safety devices were tested each day. These tests included “high booming” the crane arm to ensure that the safety switches would trigger. In the five weeks of use before the accident, the crane performed without incident. On the morning of the accident, the switches were tested by plaintiff’s decedent Leo and NY Crane employees and were all found to be properly functioning. In late April 2008, Brady Marine informed Lomma that a second RTR turntable, in a different crane at a different site, had a visibly bad weld that was pitted with cavities and obviously not fused properly. Lomma conceded that he did not take any action to determine whether the first bearing purchased, the “052,” which was by then in use at the East 91st Street construction site, was similarly flawed. However, because of the flaw in the second bearing, RTR discounted the bearing it manufactured for Lomma for a third crane by $6,000. The Accident On May 30, 2008, shortly before 8:00 a.m., the crane was being used to construct the 14th floor of the project, specifically to lift a basket containing electricians’ tools. The signalman directed Leo to bring the headache ball directly over the basket and lower the line. The signalman testified that when the headache ball was approximately 30 to 40 feet above the ground, which was at the level of the second floor of the new construction, stationary, with nothing on the line, the crane began to tip backwards. The crane tilted and began to slide from the top of its tower, causing the boom to go backwards 84-85 degrees, flip, and strike the building across the street. Sorbara’s vice-president, Joseph Sorbara, testified that just before the collapse, he was standing on the top deck of the building under construction, the 14th floor at that time, about 30 feet away from the crane, watching the headache ball, at about 50 feet below the boom tip, headed downward. About 15 seconds later, he heard screaming, and looked to see the crane falling backwards, its headache ball below his field of vision. Sorbara also testified that the crane seemed to collapse in slow motion, debris flying through the air. Plaintiffs’ assertion at trial was that the accident was the result of the failure of a weld performed by RTR during manufacture of the bearing that was both poorly and incompletely fused. Defendants contended that the weld failure was not a precipitating cause of the accident. At trial, the following experts testified on behalf of plaintiffs. Dr. Eric Kaufmann, metallurgist with Ove, Arup & Partners (Arup),[3] tested the RTR welds, finding defects of multiple types, i.e., incomplete fusions, brittle fractures, and hydrogen cracking, in the RTR welds in every section of the bearing, causing 60-65% loss of strength, making the turntable incapable of carrying its intended loads. Ashraf Metwally, P.E., also of Arup, testified that the cause of the crane collapse was the sequential progressive failure of the RTR welds, the two pieces of the turntable bearing breaking apart like a zipper opening. Dr. Richard H. McSwain, a materials engineer, testified that he conducted extensive destructive testing on the RTR welds, and determined that the RTR welds were improperly made, lacked fusion, had high slag content, and were brittle and excessively hard, which caused them to separate. Dr. Dennis Deegan, a metal engineer specializing in failure analysis, testified inter alia, that the weld had multiple defects and was one of the worst he had ever analyzed. Deegan opined that two-blocking, as asserted by defendants, could not have occurred, because there were no “witness” marks, metallurgical transfers, on the headache ball or point sheave, or between the two, which showed that they had not come into contact with each other. Mechanical engineer Dr. Stewart Brown testified that the RTR weld had a network of cracks and was undersized, causing the crane to fail. Lawrence Shapiro, also a physical engineer, concluded that the crane failed due to an improperly fused weld, and broadly agreed with the findings in the Arup report. Defendants’ expert, Edward Cox, a physical engineer, opined that although the RTR bearing had combined defects of 15% and the welds were not in code compliance and would have been rejected by an engineer, the weld failure was not a precipitating cause of the accident. According to Cox, for the crane to have collapsed due to a “zipper effect,” as suggested by plaintiffs’ experts, there would need to be evidence of fatigue, and he found none. Nor, according to Cox, was there evidence of a start or stop point. According to Cox, Kaufmann’s analysis was flawed, his conclusion that there was shallow fusion of the welds failing to take into account beveling that deepened the fusion. In addition, Cox stated that the force necessary to break the weld assembly had already been withstood by the turntable in its operations. He agreed, however, that as a mechanical engineer, he would not have certified a bearing that was created from a manufacturer’s drawings for a different bearing altered by a mechanic. The jury found that Lomma, JF Lomma, and NY Crane were negligent and that their negligence was a substantial factor in causing the accident. It also found defendants’ actions to be reckless and wanton. The jury further found JF Lomma and Lomma liable for NY Crane’s negligence. Piercing the Corporate Veil We find that there was sufficient evidence to permit the jury to pierce the corporate veils. The evidence supported the jury’s conclusion that the multiple Lomma corporations conducted business as a single entity (Shisgal v Brown, 21 AD3d 845, 848-849 [1st Dept 2005]; see also Matter of Morris v New York State Dept. of Taxation & Fin., 82 NY2d 135, 140-141 [1993]; Tap Holdings, LLC v Orix Fin. Corp., 109 AD3d 167, 174 [1st Dept 2013]). The evidence established that NY Crane and JF Lomma, both incorporated in Delaware, rented cranes, while a second corporation named JF Lomma, incorporated in New Jersey, trucked the cranes to and from customers. Most of the cranes rented out by defendants were owned by nonparty Lomma Corporation, JLJD, which leased them to other Lomma companies for sublease to customers. Lomma’s entities rented out each other’s equipment at will; actual ownership did not matter. Lomma would decide later how much one company should pay the other, and thus had the ability to shift profits between companies. Lomma signed blank DOB CD forms — the forms necessary for the registration of a crane for use at a particular construction site — so that the general manager could fill in which company was renting out which crane on any particular job. Although NY Crane’s tax returns stated that all the company’s equipment was stored in Brooklyn, the various Lomma entities kept their equipment, including the crane involved in this accident, at a yard in New Jersey personally owned by Lomma. None of the Lomma companies paid rent for use of the yard, and JF Lomma (NJ) paid the taxes. All Lomma companies shared the same offices and email system, and there was overlap of management and administrative personnel. All senior management, including Lomma and in-house counsel, were paid by JF Lomma (NJ), and all salaried employees in the organization were paid through the web-based ADP payroll account of JF Lomma. The crane at issue was purchased by NY Crane, and then $500,000 in refurbishment was spent. Lomma testified that although JF Lomma paid for the crane bearings from RTR, the amount was charged back to NY Crane. However, no proof of that was presented. Repairs to the Kodiak’s turntable bearing in 2007 were made in New York and supervised by JF Lomma. JF Lomma also paid for all replacement and new crane bearings and received any applicable insurance proceeds. The evidence sufficiently established that this was more than what defendants assert, that Lomma was simply “one person who is a shareholder, officer and director in two or more corporations.” Rather, this one individual exercised domination and control over three separate corporations which he treated as one entity. There was also sufficient evidence to permit the jury to assess personal liability against Lomma. Contrary to Lomma’s arguments, plaintiffs presented substantial evidence of Lom-ma’s personal participation in the corporate defendants’ affirmatively tortious acts launching the dangerous instrumentality that caused the deaths of plaintiffs’ decedents (see Peguero v 601 Realty Corp., 58 AD3d 556, 558-559 [1st Dept 2009]). Preclusion of Expert Testimony The trial court properly precluded the proposed testimony of defense expert James Wiethorn, which not only was not based on facts in the record, but also contradicted facts in the record (see Chung v New York City Bd. of Educ., 136 AD3d 608, 609 [1st Dept 2016]; Guzman v 4030 Bronx Blvd. Assoc. L.L.C., 54 AD3d 42, 49 [1st Dept 2008]; Rosa v General Motors Corp., 226 AD2d 213 [1st Dept 1996]; Gomez v New York City Hous. Auth., 217 AD2d 110, 117 [1st Dept 1995]). Parenthetically, the validity of Wiethorn’s opinion has come before this Court previously, in connection with appeals by Sor-bara and DeMatteis as to their claims for contractual indemnity against each other (Matter of 91st St. Crane Collapse Litig., 133 AD3d 478 [1st Dept 2015]). In that appeal, DeMatteis argued, as NY Crane did at trial, that the accident was caused not by a faulty weld but by Leo in high booming and two-blocking the crane. DeMatteis relied on Wiethorn’s report. This Court rejected the argument, finding that insufficient evidence supported Wiethorn’s theory. Wiethorn’s opinion was based on two facts: that a portion of the boom tip of the collapsed crane was damaged and that the “headache ball” used to ballast the hoist line was found to the north of the crane rubble. These facts are “consistent with” Wiethorn’s theory that the crane collapse was caused by operator (Leo’s) misuse, but they are equally consistent with other theories. Most importantly, none of the multiple eyewitnesses to the crane collapse testified to facts that would support Wiethorn’s theory. Indeed, his opinion was contradicted by both the witnesses and the physical evidence. Wiethorn’s claims of two-blocking and high booming were unsupported by any evidentiary foundation. Defendants’ theory requires that Leo suddenly pulled the line up at great speed, striking the tip of the boom, sending the boom straight back, and tipping the cab over to the back with it. But none of the multiple witnesses, party or nonparty, testified to anything consistent with this theory. Defendants’ theory also completely discounts all evidence concerning the multiple safeties that were in place and tested as working the very morning of the accident. The high boom limit was not crushed, which it would have been if the boom had gone above set levels, and the A2B switch, which would have flown off the line had the headache ball been two-blocked, was still present after the accident. Wiethorn’s assertion that the workers must have removed or tampered with them is unsupported by any evidence, with no reasonable basis to believe it occurred. The trial court properly concluded that allowing Wiethorn to testify would be to allow him to render a conclusory opinion based only upon speculation and in contradiction to the evidence adduced at trial (Wong v Goldbaum, 23 AD3d 277 [1st Dept 2005]). Damages The jury awarded plaintiff Leo $7.5 million for preimpact terror, $8 million for post-injury pain and suffering, and $24 million in punitive damages. It awarded plaintiffs Sinanaj and Sinanovic $7.5 million for Kurtaj’s preimpact terror, $24 million for his post-injury pain and suffering, and $24 million in punitive damages. We find that these awards are excessive. A jury award is excessive “if it deviates materially from what would be reasonable compensation” (CPLR 5501 [c]). Courts are required to look to similar appealed verdicts to determine whether a material deviation exists (Donlon v City of New York, 284 AD2d 13, 14 [1st Dept 2001]). As noted by defendants, there are no verdicts similar to the verdicts in this case. However, there are also no cases that are similar in facts or present such a confluence of facts: catastrophic injuries leading to death, and egregious, wanton disregard for potential loss of life and property. “In determining damages for conscious pain and suffering experienced in the interval between injury and death, when the interval is relatively short, the degree of consciousness, severity of pain, apprehension of impending death, along with duration, are all elements to be considered” (Regan v Long Is. R.R. Co., 128 AD2d 511, 512 [2d Dept 1987]; see also Garcia v Queens Surface Corp., 271 AD2d 277, 278 [1st Dept 2000] [“When comparing injuries and awards, it is incumbent upon us to consider not only the type of injury and the level of pain, but the period of time for which that pain is being calculated”]). Preimpact terror is a sub-category of conscious pain and suffering (see e.g. Donofrio v Montalbano, 240 AD2d 617 [2d Dept 1997]). “Damages for pre-impact terror are designed to compensate the decedent’s estate for the fear the decedent experienced during the interval between the moment the decedent appreciated the danger resulting in the decedent’s death and the moment the decedent sustained a physical injury as a result of the danger” (NY PJI 2:320, Comment, Caveat 3; see McKenna v Reale, 137 AD3d 1533, 1535 [3d Dept 2016]). There must be some evidence that the decedent perceived the likelihood of grave injury or death before the impact, and suffered emotional distress as a result (see Keenan v Molloy, 137 AD3d 868 [2d Dept 2016], lv denied 27 NY3d 908 [2016]). The evidence supported the jury’s findings that Leo and Kurtaj both endured inconceivable preimpact terror (see Lang v Bouju, 245 AD2d 1000, 1001 [3d Dept 1997]). It is undisputed that the crane did not fall straight to the ground. With Leo in the glass cab, it first teetered, and then fell backward from a height of 200 feet (approximately 14 stories), struck the Electra building, and bounced off a number of terraces before reaching the ground, where it crashed down onto Kurtaj. Leo, trapped in the glass cab, was aware of his impending death, as detailed by witnesses in the adjacent apartment buildings. Witnesses described the look of sheer panic and fear on Leo’s face. They described him making a series of hand movements and putting his hands together as if praying. They described him as then seeming to attempt to brace himself, placing both his hands forward on the cab glass, and they described the cab as ultimately sliding to Leo’s left side until it was gone. As the crane careened off the building, Leo’s arms and legs were broken, but he still tried to brace himself, and ultimately he resigned himself to his fate. Kurtaj saw what was happening and yelled to his coworkers, “Run, run, the crane is coming down.” A medical expert testified, based on defensive injuries to Kurtaj’s forearm, that Kurtaj was aware of the crane collapsing on him and tried to protect himself from the falling crane and debris by elevating his right hand to shield himself, which resulted in the cracking of his right wrist and the cracking and fracturing of his right leg as he became trapped in the debris. While the award to each plaintiff of $7.5 million for preim-pact terror materially deviates from reasonable compensation, the record indicates that plaintiffs’ decedents each endured a period of preimpact terror. We find therefore that the awards to Leo and Kurtaj for the preimpact terror should be reduced to $2.5 million and $2 million, respectively. “With regard to conscious pain and suffering, such a claim ‘requires proof that the injured party experienced some level of cognitive awareness following the injury’. Further, there is no requirement that ‘the fact finder . . . sort out varying degrees of cognition and determine at what level a particular deprivation can be fully appreciated’ ” (,Sanchez v City of New York, 97 AD3d 501, 506 [1st Dept 2012] [citation omitted]). “Plaintiffs have the threshold burden of proving consciousness for at least some period of time following an accident,” which “can be satisfied by direct or circumstantial evidence,” but not by “[m]ere conjecture, surmise or speculation” (Cummins v County of Onondaga, 84 NY2d 322, 324-325 [1994] [internal quotation marks omitted]). The injuries Leo sustained from the impact were “blunt impact head trauma” with “cranial fracturing,” “pulpification of the brain” and “near-complete decapitation.” Specifically, Leo suffered multiple rib fractures piercing his lungs, a fractured pelvis, head trauma, bilateral humerus fractures, and bilateral transected leg fractures. Medical testimony was elicited that the fractures to his arms and legs indicated that he was aware of his situation and tried to brace himself, aware of his impending death. It was also opined that Leo was consciously aware, and under a significant amount of physical and mental distress, while trapped in the glass cab, alone, and able to see everything as it happened. Leo’s father, also a crane operator, saw his son in the rubble with his eyes open and shaking. The EMS technician reported him as alive and conscious approximately seven minutes after the accident, and the medical examiner determined the time of death to be nine minutes after that. We agree with defendants that the award of $8 million deviates materially from reasonable compensation (see e.g. Ramos v La Montana Moving & Stor., 247 AD2d 333, 333 [1st Dept 1998] [awarding $900,000 for 15 to 30 minutes of “excruciating crushing injuries”]; Perez v St. Vincents Hosp. & Med. Ctr. ofN.Y., 66 AD3d 663 [2d Dept 2009] [award of $800,000 as to damages for conscious pain and suffering]). However, we also acknowledge that the facts of the cited cases are not in all respects analogous to the facts and circumstances of this case. Accordingly, we find that the award to Leo for conscious pain and suffering should be reduced to $5.5 million. Kurtaj was hit with the heaviest of crane components, including the moving counterweights and fixed counterweights, parts weighing in excess of 25,000 pounds, which smashed his body and caused degloving and bone-shattering injuries to his vertebrae, upper and lower extremities, chest, abdomen and midsection. The fire department chief testified that Kurtaj was alive and conscious while trapped. This was corroborated by other witness testimony that, while trapped under the wreckage, Kurtaj was screaming and in obvious pain. The EMS technician testified that Kurtaj was alive, conscious, moaning in pain, and visibly suffering during the transport to the hospital. Because he was doused in diesel fuel, he had difficultly breathing, was choking on noxious fumes and smoke, and was vomiting. Kurtaj remained conscious and in pain, without the benefit of painkillers, until he was taken into the operating room at 11:00 a.m., after which he expired— approximately four hours after the crane collapsed. While the award of $24 million for pain and suffering materially deviates from reasonable compensation (see Dowd v New York City Tr. Auth., 78 AD3d 884 [2d Dept 2010] [plaintiff hit by a bus, went into cardiac arrest 18 minutes later, and was pronounced dead 90 minutes after being hit; jury awarded $1.75 million for conscious pain and suffering; Second Department reduced award to $1.2 million]; Lubecki v City of New York, 304 AD2d 224 [1st Dept 2003], lv denied 2 NY3d 701 [2004] [plaintiff, who was taken hostage and accidentally shot by NYPD, survived for about one hour; jury awarded $4.5 million for conscious pain and suffering; trial court reduced this award to $3 million; this Court affirmed]), we again acknowledge that the inconceivable pain and suffering endured by Kur-taj warrants a variance from the cited awards. Accordingly, we find that the award to Kurtaj for conscious pain and suffering should be reduced to $7.5 million. We turn now to punitive damages. “The purpose of punitive damages is not to compensate the plaintiff but to punish the defendant for (wanton and reckless, malicious) acts and thereby to discourage the defendant and other (people, companies) from acting in a similar way in the future” (PJI 2:278; see also Ross v Louise Wise Servs., Inc., 8 NY3d 478, 489 [2007]; Frankson v Brown & Williamson Tobacco Corp., 67 AD3d 213, 219 [2d Dept 2009]). An employer may be assessed punitive damages for an employee’s conduct only if “a superior officer in the course of employment orders, participates in, or ratifies” the conduct (Loughry v Lincoln First Bank, 67 NY2d 369, 378 [1986]). While Lomma and his companies, which dominated the crane rental market in New York, may not have intended to cause plaintiffs’ decedents’ deaths, these deaths nevertheless arose from a series of calculated decisions made by Lomma over a period of months, during which time Lomma placed profit over the safety of construction workers and the public, despite having multiple opportunities to change course. Evidence established that when Lomma found the cost of replacing a broken crane bearing too high, he instructed an employee who had no knowledge of manufacture, welding, or engineering to find an alternative source. This source was RTR, a China-based distributor, which subcontracted work to factories in China. Although Lomma was aware that RTR stated that it did not have confidence in its ability to weld the replacement component, and also that RTR admitted confusion as to the specifications of the bearing, he directed RTR to proceed — all in an apparent attempt to save money. Once the bearing was received, Lomma failed to have the welds tested; after being told by engineers that none of them would certify the new part, Lomma, who was not an engineer or a welder, self-certified the part. Lomma also called upon a former employee who had gone to work at DOB, instead of the assigned DOB employee, to conduct the necessary preopera-tional inspections. Further, one month before the accident, when another RTR bearing on a different crane was discovered to have visibly defective welds, Lomma did nothing to determine whether the bearing’s weld on the East 91st Street crane was similarly defective. Instead, he merely negotiated a price rebate. Lomma allowed the bearing to continue to be used until its welds failed, causing the crane collapse that killed Leo and Kurtaj. This crane collapse occurred shortly before 8:00 a.m. on a Friday morning in a densely populated residential area with individuals following their normal routines of going to work, school and other activities. That there were not more lives lost and/or property damaged is something of a miracle. Had this even occurred later in the day, the consequences of defendants’ wanton and egregious actions could have been far more devastating. In reviewing the propriety of a punitive damages award, this Court must consider whether the amount “deviates materially from what would be reasonable compensation” (CPLR 5501 [c]; Cardoza v City of New York, 139 AD3d 151, 166 [1st Dept 2016]), including whether it is “reasonably related to the harm done and the flagrancy of the conduct” (Liberman v Riverside Mem. Chapel, 225 AD2d 283, 292 [1st Dept 1996]). A defendant’s wealth is also material to the assessment of punitive damages (see McIntyre v Manhattan Ford, Lincoln-Mercury, 256 AD2d 269, 271 [1st Dept 1998], lv denied 94 NY2d 753 [1999]). “ [I]t is the duty of the court to keep a verdict for punitive damages within reasonable bounds considering the purpose to be achieved as well as the mala fides of the defendant in the particular case” (Faulk v Aware, Inc., 19 AD2d 464, 472 [1st Dept 1963], affd 14 NY2d 899 [1964]; see also Ironwood, L.L.C. v JGB Props., LLC, 130 AD3d 1527 [4th Dept 2015], lv denied 26 NY3d 908 [2015]). Moreover, “[although states possess considerable discretion over the imposition of punitive damages, the United States Supreme Court has emphasized that there are constitutional limitations on such awards, and that the Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments upon a tortfeasor” (Frankson v Brown & Williamson Tobacco Corp., 67 AD3d at 219). Factors to be considered include “the degree of reprehensibility . . .; the disparity between the harm or potential harm suffered . . . and [the] punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases” (BMW of North America, Inc. v Gore, 517 US 559, 575 [1996]; Sawtelle v Waddell & Reed, 304 AD2d 103, 108-110 [1st Dept 2003]). Giving due consideration to the nature of defendants’ reprehensible conduct, plaintiffs’ high sustainable compensatory damages, and defendants’ financial condition, we find that the awards of punitive damages should be reduced to $8 million for Leo and $9.5 million for Kurtaj, sums sufficient to punish defendants and deter future misconduct (see e.g. Brown v LaFontaine-Rish Med. Assoc., 33 AD3d 470 [1st Dept 2006]) and that will not run afoul of constitutional standards. Accordingly, the judgment of the Supreme Court, New York County (Manuel J. Mendez, J.), entered January 5, 2016, upon a jury verdict, to the extent appealed from as limited by the briefs, awarding plaintiff Leo $7.5 million for the preimpact terror and $8 million for the pain and suffering of her decedent, and $24 million in punitive damages as against defendants James F. Lomma, J.F. Lomma, Inc., and New York Crane & Equipment Corp., should be modified, on the law and the facts, to direct a new trial as to such damages unless plaintiff stipulates, within 30 days after service of a copy of this order with notice of entry, to reduce the award for preimpact terror to $2.5 million, the award for pain and suffering to $5.5 million, and the award of punitive damages to $8 million, and to the entry of an amended judgment in accordance therewith, and otherwise affirmed, without costs. In the event plaintiff Leo stipulates to the reduced awards, as modified herein, within 30 days of service of a copy of this order, with notice of entry, the Clerk is directed to enter judgment accordingly. The judgment of the same court and Justice, and same entry date, upon a jury verdict, to the extent appealed from as limited by the briefs, awarding plaintiffs Sinanaj and Sinanovic $7.5 million for the preimpact terror and $24 million for the pain and suffering of their decedent, and $24 million in punitive damages against defendants James F. Lomma, J.F. Lomma, Inc., and New York Crane & Equipment Corp., should be modified, on the law and the facts, to direct a new trial as to such damages unless plaintiffs stipulate, within 30 days after service of a copy of this order with notice of entry, to reduce the award for preimpact terror to $2 million, the award for pain and suffering to $7.5 million, and the award of punitive damages to $9.5 million, and to the entry of an amended judgment in accordance therewith, and otherwise affirmed, without costs. In the event plaintiffs Sinanaj and Sinanovic stipulate to the reduced awards, as modified herein, within 30 days of service of a copy of this order, with notice of entry, the Clerk is directed to enter judgment accordingly. Acosta, P.J., Friedman, Andrias and Gesmer, JJ., concur. Judgment Supreme Court, New York County, entered January 5, 2016, modified, on the law and the facts, to direct a new trial as to damages for preimpact terror and pain and suffering of plaintiff Leo’s decedent and punitive damages unless plaintiff Leo stipulates, within 30 days after service of a copy of this order with notice of entry, to reduce the award for pre-impact terror to $2.5 million, the award for pain and suffering to $5.5 million, and the award of punitive damages to $8 million, and to the entry of an amended judgment in accordance therewith, and otherwise affirmed, without costs. In the event plaintiff Leo stipulates to the reduced awards, as modified herein, within 30 days of service of a copy of this order, with notice of entry, the Clerk is directed to enter judgment accordingly. Judgment, same court, justice and entry date, modified, on law and the facts, to direct a new trial as to damages for preimpact terror and pain and suffering of plaintiffs Sinanaj and Sinanovic’s decedent and punitive damages unless plaintiffs Sinanaj and Sinanovic stipulate, within 30 days after service of a copy of this order with notice of entry, to reduce the award for preimpact terror to $2 million, the award for pain and suffering to $7.5 million, and the award of punitive damages to $9.5 million, and to the entry of an amended judgment in accordance therewith, and otherwise affirmed, without costs. In the event plaintiffs Sinanaj and Sinanovic stipulate to the reduced awards, as modified herein, within 30 days of service of a copy of this order, with notice of entry, the Clerk is directed to enter judgment accordingly. . Sorbara and DeMatteis settled with plaintiffs before trial. . Language apparently also played a role in the miseommunications. . Arup, a multidisciplinary engineering and technical firm, conducted an extensive investigation at the behest of the City of New York.